**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **DELISA SMITH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 09 C 6210** |
| ) | |
| **MICHAEL J. ASTRUE, Commissioner** ) | |
| **of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Plaintiff Delisa Smith returns to this Court to appeal the decision of the Social

Security Administration (SSA) to deny for the second time her request for disability

insurance benefits (DIB) and Supplemental Security Income (SSI). The Court grants

Smith's motion for summary judgment, denies the Commissioner's motion, and

remands the case to the SSA.

**Facts**

**1.     Prior proceedings**

On September 8, 2003, while working as a mail services delivery driver, Smith

was involved in a traffic collision that caused injuries that she says prevent her from

working. Before that, Smith, who completed tenth grade, had worked as a dietary aide,

airport transporter, and prep cook.

Smith first applied for DIB and SSI in 2004. After a hearing held in 2005, an

administrative law judge (ALJ) denied her claim for benefits. The ALJ found Smith had

anemia, was obese, and had severe impairments in her left knee and back. But he found that although these impairments placed significant limitations on Smith's ability to work, they did not meet or equal an impairment listed in the Social Security disability regulations. The ALJ also found that although Smith could not perform her past work, there was other available work that she was capable of performing.

After the SSA's Appeals Council denied Smith's request for review, she filed suit in this Court. On June 25, 2007, the Court vacated the ALJ's ruling and remanded the case to the SSA. *Smith v. Astrue*, No. 06 C 2844, slip op. (N.D. Ill. June 25, 2007) ("*Smith I*"). First, the Court concluded that it was appropriate to remand the case so that the ALJ could consider new evidence obtained several days after Smith's hearing, namely an EMG report that appeared to provide an objective basis for Smith's claim of an impairment. *Id.* at 7-8. Second, the Court concluded that the ALJ had improperly found Smith incredible based on the purported lack of objective or independent evidence to corroborate her testimony, without dealing with other evidence that appeared to be corroborative (in particular, an evaluation by a Dr. Ogan just prior to her hearing). *Id.* at 9-10. Third, the Court took issue with the sufficiency of the support the ALJ marshaled for his determination that Smith's statements over the time period at issue were inconsistent. *Id.* at 10. Fourth, the Court concluded that in questioning the vocational expert (VE), the ALJ had inappropriately precluded the VE from considering one of Smith's impairments, specifically her obesity. Finally, the Court found inadequate the ALJ's explanation for why he believed Smith matched the criteria of a hypothetical non-disabled person he described in questioning the VE. *Id.* at 11.

## 2.    The evidence

Before the September 2003 accident, Smith's job was physically demanding and at times required her to lift more than seventy pounds.  The collision took place when another vehicle hit the van she was driving, causing the van to spin around, injuring her back and causing her left knee to hit the interior of her vehicle.  Smith was treated at a hospital the day of the crash and was released with a prescription saying she should be on "light duty for one week."  R. 221.  A few days later, she returned to the hospital by ambulance due to pain.  Her physician permitted her to go back to work on September 19 as long as she did not lift any weight, stand or walk for more than ten minutes an hour, sit less than ninety percent of the time, bend, or drive.  R. 138.  In December 2003, Smith's physician, Dr. Giri Gireesan, gave her a disability certificate stating that she was "totally incapacitated" until she recovered.  R. 139.

In the years following the crash, Smith underwent extensive medical treatment.  An October 2003 MRI of her left knee indicated a possible soft tissue injury, prepatellar bursitis (inflammation over the front of the knee), a possible intra-articular loose body (i.e., within the knee joint), and subchondral degenerative change involving the patella.  The physician reviewing the MRI thought Smith had patellofemoral arthritis.  R. 157.

In June 2004, Smith's treating physician Dr. Deidra Greathouse noted that Smith was requesting a letter for disability and that she was not sure whether Smith was "malingering."  Dr. Greathouse also reported, however, that she would fill out the necessary forms if Smith provided them to her.  R. 230.  In September 2004, Dr. Greathouse reported that Smith told her that physical therapy was going "wonderful" and that the pain had improved and only came back after a lot of movement.  R. 176.

3

In November 2004, Smith saw Dr. Peter Biale, who performed a consultative examination in connection with Smith's application for DIB and SSI benefits. Dr. Biale found a full range of motion of the cervical spine but a limited range of motion of the lumbosacral spine. He found tenderness of the paraspinal muscles and positive straight-leg raise tests for both legs. (The straight leg raise test is done to determine whether a patient with lower back pain has a herniated disk.) Dr. Biale also found limited flexion of Smith's left knee. He noted that Smith had "a severe limp" and an inability to heel walk and toe walk, though she did not use a cane to walk. She was also unable to squat and had difficulty getting on and off of the examination table, which Dr. Biale attributed to problems with her knee and back. He found no problems with Smith's hand grip on either side. R. 184-85. He also noted that Smith had anemia. R. 185. An x-ray of Smith's spine taken the day of the examination showed no fracture or dislocation of the lumbosacral spine. R. 186.

On April 29, 2005, Dr. Alvin Goldberg, one of Smith's treating physicians, found Smith to be temporarily totally disabled from then until February 28, 2006. R. 402. Dr. Goldberg's notes reflect that Smith had "Lower Back pain with Lt Root Pain," and a differential diagnosis of "HNP vs. SPRAIN." *Id.* The reference to "HNP" is likely a reference to the possibility of a "herniated nucleus pulposus," i.e. a herniated disk.

A June 2005 MRI of Smith's left knee found mild patellofemoral osteoarthritis and/or chondromalacia patella and a small joint effusion (a buildup of fluid). R. 200. In June 2005, orthopedic specialist Dr. Daniel Newman (Dr. D. Newman) began to treat Smith. R. 213. In what he described as a "limited examination," Dr. D. Newman noted that Smith appeared to be in severe pain because of her back and left knee but that

4

there were "no significant objective findings" to explain the pain.  R. 214.

A June 2005 CAT scan of Smith's lumbosacral spine did not show any evidence of disc herniation.  R. 202.  A July 2005 MRI of Smith's lumbar spine, however, revealed a "mild" two to three millimeter "posterior disc bulge elevating the posterior longitudinal ligament and indenting the ventral surface of the thecal sac without significant spinal stenosis."  The test also revealed a "mild generalized left neuroforaminal narrowing .  .  .  ."  R. 199.

In August 2005, Dr. D. Newman examined Smith again.  He reported that Smith advised him that she had almost continuous pain in her lower back; walking, climbing, and standing increased this; and she got relief only by lying down.  Smith also stated that her knee pain was greatest when descending stairs.  Dr. D. Newman found degenerative changes in her left knee.  He also reported that Smith was obese.  His only specific finding, however, was that Smith had chondromalacia patella, a common cause of chronic knee pain.  He reported that he wanted to conduct an EMG test of Smith's left leg because of problems with her ankle reflex.  But he also wrote that he doubted the bulging disc was causing her back pain.  R. 211-12.  An August 22, 2005 MRI of Smith's lumbar spine found a minimal amount of scoliosis and "no evidence for . . . well-defined disc herniations or protrusions."  R. 219.

After another examination in October 2005, Dr. D. Newman wrote to Dr. Goldberg that the EMG test on Smith's leg had been attempted but not completed, though it did show "some abnormalities on the left side."  He wrote that Smith was a candidate for an epidural injection in her back "in spite of the paucity of findings on the MRI."  He also stated that "if [Smith's] knee pain persists after the back and radiating

5

pain are gone, an arthroscopy [on the left knee] is a possibility." R. 209.

In September 2005, neurosurgeon Dr. Hernando Torres wrote after an examination of Smith that his impression was that she had "lumbar syndrome" and "thoracic syndrome." He ordered an MRI of the thoracic spine and also wanted Smith to have physical therapy. He also gave her a back brace and told her she needed to lose about 100 pounds. At the time of her examination, Smith's weight was 252 pounds, and she was five feet, seven inches tall. R. 215-17. A thoracic spine MRI, taken on September 26, 2005, showed disc dehydration, but no disc herniation or canal impingement. R. 198. (The Court notes, however, that Smith's problems had been focused in her lower back, not the thoracic region.)

Smith saw pain management specialist Dr. Brian Ogan in November 2005. Dr. Ogan examined Smith's medical records and conducted a physical examination. He provided detailed notes of his findings. Dr. Ogan also noted the July 2005 MRI examination that had shown a bulging disk at L5-S1, as well as the October 2003 MRI examination that had shown patellofemoral arthritis and a possible intra-articular loose body. R. 206-07. He concluded that Smith's "stated pain complaint, as well as her mechanism of injury is consistent with her physical exam and MRI findings." R. 207. He recommended lumbar epidural steroid injections because more conservative treatment had not been successful. *Id.* Dr. Ogan administered an epidural steroid injection on November 17, 2005.

On December 9, 2005, the ALJ held the first hearing. On December 15, Smith was able to complete the EMG test that later became the primary basis for the Court's remand order. The December 2005 EMG test resulted in findings "compatible with

6

chronic radiculopathy bilaterally greatest in left S1 and right L5 distribution." R. 441.
The results of this EMG test were not before the ALJ when he initially denied Smith's
request for benefits.

On the day of her EMG test, Smith had another appointment with Dr. D.
Newman. After the visit, Dr. D. Newman wrote to Dr. Goldberg that the MRI suggested
"a possible lesion at L5-S1 more on the left side." He also noted that the EMG test was
positive and that Smith had a decreased left ankle reflex. Dr. D. Newman wrote that
Smith was a surgery candidate and should see Dr. Charles Slack, a surgeon, because
she had not responded well to more conservative treatment. R. 341. Smith scheduled
an appointment with Dr. D. Newman and Dr. Slack together. On February 8, 2006, Dr.
D. Newman wrote to Dr. Goldberg that Dr. Slack had been unable to attend the
appointment but that he (Dr. D. Newman) "think[s] she has a herniated disk that
requires surgery." R. 340.

Dr. Slack saw Smith on February 22, 2006. After referencing a number of the
tests Smith had undergone, but not the December 2005 EMG, Dr. Slack reported that
Smith "appears to have a myofascial pain response . . . with positive EMG and slight
disk bulging changes at L5-S1." He suggested that Smith be evaluated by a pain
specialist, try Lidoderm patches on her back, and continue seeing Dr. D. Newman to
treat her knee. Dr. Slack stated that Smith "is not a surgical candidate." He suggested
that after completing treatment on her knee, Smith should undergo a functional capacity
evaluation to determine if she could begin working again. Dr. Slack concluded,
however, that until her pain level could be controlled, Smith was "temporarily totally
disabled from work." R. 432-33.

7

Dr. D. Newman also examined Smith on February 22, 2006. He reported to Dr. Goldberg that he thought Smith's knee had "degenerative arthritis which may have been aggravated by the accident." He recommended that Smith take anti-inflammatory medication for pain relief. He stated, however, that he did not think that arthroscopic surgery was required for her knee "based on the MRI or physical findings." R. 434.

Smith underwent another radiological examination of her left leg on August 2, 2006. The examination showed mild degenerative joint disease of her left knee. R. 429. In November 2007, Smith had an MRI taken of her left knee. The MRI showed small osteophytic spurs consistent with early degenerative changes. It also detected what was most likely a traumatic prepatellar bursitis. R. 425. (The Court notes that this MRI examination was consistent with the MRI examination that Smith had in October 2003, which indicated prepatellar bursitis and patellofemoral arthritis, among other things. R. 157.)

Objective signs of carpal tunnel syndrome began emerging in 2006. A December 2006 EMG of Smith's right arm found moderate carpal tunnel syndrome in the right arm. R. 428. On April 17, 2008, hand surgeon Dr. Orhan Kaymakcalan wrote Smith's lawyer that he had begun seeing Smith in January 2007 and had found four neuropathies on her right side, including carpal tunnel syndrome. He wrote that Smith had declined to undergo surgery. R. 457.

In October 2007, at the SSA's request, Dr. James Elmes examined Smith following this Court's remand order. He reviewed Smith's medical records and spent ninety minutes with her. R. 343. He also conducted an examination of Smith, including physical testing.

8

Dr. Elmes noted that Smith could get on and off the examination table with "slight help," though she did become short of breath.  R. 345.  He also noted that she needed help tying her shoes because of stiffness and pain in her fingers and hands.  She could not turn a key in a door lock with her right hand.  He also found less grip strength on her right side.  Dr. Elmes' examination also showed decreased strength in Smith's right arm and left leg.  R. 346.

Dr. Elmes stated with regard to Smith's back pain that her responses on five of the six tests he performed were "inappropriate," which Dr. Elmes stated was "probable for symptom magnification," in other words, exaggeration of her symptoms.  R. 347-48.

It does not appear from Dr. Elmes' report that he saw the December 2006 EMG test results on Smith's right arm.  This, however, does not appear to be significant, as Dr. Elmes concluded even without this that Smith had right carpal tunnel syndrome.

After examining Smith and reviewing her medical records, he found that she had the following impairments, among others:  L5-S1 bilateral foraminal stenosis associated with her low back pain; an L5 disc bulge of two to three millimeters; mild osteoarthritis and chondromalacia of the left knee; minimal hypertrophic changes of the lumbar spine; right carpal tunnel syndrome, dextroscoliosis of the thoracolumbar spine; and obesity. R. 347-48.

Dr. Elmes found that Smith had significant restrictions on her ability to work.  He found that she could lift and carry five pounds up to one-third of the time but should never lift more than that.  R. 349.  He also found that Smith could sit for thirty minutes without interruption, for a total of up to five hours in an eight-hour work day.  Dr. Elmes found that Smith could stand up to thirty minutes at a time, for a total of a half-hour

9

during an eight-hour work day.  Among other restrictions, Dr. Elmes found that Smith could walk for only fifteen to twenty minutes at a time and for up to a half-hour in a work day.  R. 350.  He stated that Smith could not perform activities like shopping, could not use standard public transportation, and could not travel without assistance.  Dr. Elmes also reported that he believed Smith's restrictions had lasted or would last for twelve consecutive months.  R. 354.

In January 2008, Smith underwent another MRI on her thoracic spine, which was "unremarkable."  R. 424.  This, however, does not appear to have had any bearing on Smith's claim of disability.  The earlier findings regarding Smith's back problems were in the lumbar and sacral regions of the spine, not the thoracic region.

Smith's treating physician, Dr. Patricia Benitez, signed an affidavit on March 4, 2008 in which she stated that in her opinion, Smith was not malingering and that her symptoms matched her complaints.  Dr. Benitez stated that she had treated Smith since the accident in 2003.  She said Smith had a herniated disc at the L5-S1 level; her symptoms indicated nerve root compression; and the December 2005 EMG showing bilateral chronic radiculopathy provided objective evidence of those conditions.  Dr. Benitez also stated that Smith had carpal tunnel syndrome in her right arm and likely had degenerative arthritis and post-traumatic bursitis in her left knee.  Dr. Benitez also said that Smith was obese and suffered from anemia.  R. 423B-423C.

### 3.    The second hearing

On April 18, 2008, the ALJ to whom the case had originally been assigned conducted a second hearing.  At the hearing, Smith testified that her knee hurt her "[p]ractically all day" and that the pain dated to the 2003 crash.  R. 540.  She said she

was taking Ibuprofen (800 milligrams) and Tylenol Arthritis (650 milligrams) for pain, as well as iron pills for her anemia.  R. 540, 549.  When the ALJ asked Smith to rate her lower back pain on a scale from zero to ten, she described her pain as a six.  *See* R. 289.  Smith was wearing a brace on her right arm at the hearing; she said she had pain from her elbow to her fingers.  She told the ALJ that the pain in her hand had started after the accident but had become worse over time, and by the time of the hearing, she could only dial a phone with her right hand and pick up a light cup.  R. 542-45.  Smith also testified that she is right-handed.  R. 548.  (Smith had not mentioned arm pain at her first hearing in 2005.  R. 44-45, 47-48.)

Smith testified that she lives with three of her five children and that they take care of chores and other tasks around the house.  R. 541-42.  She testified that she goes to physical therapy three times a week and that while at home she uses a TENS unit, which can block pain signals.  R. 546.  She said her daughter runs errands for her, though she still attends church for as long as she can sit through the service.  R. 548.  Smith said she had stopped going to movies with friends and that she spent seventy percent of the day lying down.  R. 548.  She said she could not stand for more than fifteen minutes before having to sit down and could not walk for more than fifteen minutes without a break.  R. 549.  Smith also testified that she can sit and read for only fifteen minutes before needing to take a break because of the pain.  R. 550-51.   She said her knee buckles sometimes and that it had last buckled a week before the hearing on her way to church, causing her to fall.  R. 551.  Smith also brought a cane to the hearing, though it was not prescribed by a physician.  *Id.*  She testified that she used the cane for support to avoid losing her balance when walking.  R. 552.

Orthopedic specialist Dr. William Newman (Dr. W. Newman), who reviewed Smith's medical records at the SSA's request, also testified at the second hearing. He had not conducted a physical examination of Smith. He characterized the two to three millimeter bulge in Smith's disk found in the July 2005 MRI as "extremely small," R. 503, and also noted that the August 2005 MRI showed no evidence of well-defined herniations or protrusions. R. 504. He also discussed the various tests performed on Smith's left knee and said they did not show a significant impairment of function. R. 507-11.

Dr. W. Newman also commented on Dr. Elmes' assessment of Smith's functional capacity. He opined that the assessment was "not consistent with his [Dr. Elmes'] own diagnosis." R. 513. He stated that "if you look at the listing [in the Social Security regulations], it's nonspecific back pain and nonspecific this, and that, and the other thing as far as pathology. I am interested in the actual pathology." *Id.* Later in his testimony, Dr. W. Newman stated that "[n]onspecific symptoms don't cause functional disability." R. 527.

On examination by Smith's counsel, Dr. W. Newman agreed that "chronic radiculopathy," as found in the December 2005 EMG test, was an indication of nerve compression. R. 518-19. He said that "I don't think it's the disc" but was "probably a bony thing with mild narrowing of the left neural foraminal." R. 519. He also agreed that Smith had "[m]ild to moderate" carpal tunnel syndrome." *Id.*

**4.     The ALJ's decision on remand**

After the hearing on remand, the ALJ once again denied Smith's request for benefits. The ALJ found that Smith had seven impairments that the ALJ characterized

as "severe":  radiculopathy bilaterally in S1 and L5 distribution; right carpal tunnel syndrome; dextroscoliosis; anemia; fibroids; obesity; and left patellofemoral arthritis.  R. 294.  But he found that the impairments, alone or in combination, did not meet or equal a listed impairment, including Listing 1.02 (major dysfunction of knee or carpal tunnel syndrome), 1.04 (disorder of the spine), or 7.02 (chronic anemia).  R. 294-95.

The ALJ also found that Smith had the residual functional capacity (RFC) to, among other things, lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk frequently; sit frequently; maintain concentration, persistence and pace ninety percent of the work day; and miss only five days of work a year.  In making these findings, the ALJ found Smith's description of her symptoms to lack credibility, and he rejected the opinions of several of her treating doctors, as well as that of SSA consulting physician Dr. Elmes.  The ALJ adopted the opinions of Dr. W. Newman, who had not examined Smith.

Contrary to his first decision, the ALJ found Smith's RFC allowed her to perform work she had done previously, specifically as a dietary aide.  The ALJ found that additional limitations impeded Smith's ability to do a full range of light work but that she could work in other positions, such as cashier, information clerk, and file clerk.

As a result, the ALJ found Smith not disabled.   After the Appeals Council turned down Smith's request for review, she once again filed suit in this Court.

### Discussion

### 1.        Definition of disability

Social Security regulations define disability as "the inability to do any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

A five-step process is used to evaluate whether a DIB or SSI claimant is disabled:

- Is the claimant engaged in substantial gainful activity? The ALJ found, and it is undisputed, that Smith was not engaged in substantial gainful activity.

- Is the claimant's impairment severe? If the answer is no, then the claimant is not disabled. The ALJ found, and it is undisputed, that Smith had a severe impairment or impairments.

- Does the claimant's impairment or impairments meet or equal one of the impairments listed in the Social Security regulations? If the answer is yes, the claimant is considered disabled.

- If the claimant does not meet or equal a listed impairment, can the claimant perform the work she has done in the past? If the answer is yes, the claimant is not disabled.

- After considering the claimant's residual functional capacity, age, education, and work experience, is she able to perform some other type of work? If the answer is yes, the claimant is not disabled. If the answer is no, the claimant is disabled.

*See* 20 C.F.R. § 404.1520(a)(4); *see also, e.g., Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

**2.      Standard of review**

A court will uphold the SSA's decision if the ALJ's findings are supported by substantial evidence and he committed no error of law.  42 U.S.C. § 405(g); *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000).  Substantial evidence is defined as relevant evidence that a reasonable person would consider sufficient to support a conclusion.  *Indoranto*, 374 F.3d at 473; *Smith v. Apfel*, 213 F.3d 433, 439 (7th Cir. 2000).

The substantial evidence standard, however, does not insulate the ALJ's findings and conclusions from review.  "Although this standard is generous, it is not entirely uncritical."  *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008) (internal quotation marks omitted).  A court conducts "a critical review of the evidence," considering the evidence that supports and evidence that detracts from the SSA's decision.  *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (internal quotation marks omitted).  "'The decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues.'"  *Id.* (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."  *Id.*  Though the ALJ need not "address every piece of evidence, he must articulate some legitimate reason for his decision.  Most importantly, he must build an accurate and logical bridge from the evidence to his conclusion."  *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (internal citation omitted).

Smith argues that (1) the ALJ's finding that her condition did not meet or equal

Listing 1.04 is not supported by substantial evidence; (2) the ALJ's finding that she could perform her past work was not supported by substantial evidence; (3) the ALJ improperly rejected the opinions of her treating physicians and improperly found her to lack credibility; and (4) the ALJ's finding that he could perform other work was not supported by substantial evidence.

### 3.     Listing 1.04(A)

Smith takes issue with the ALJ's determination that her impairments did not meet or equal Listing 1.04(A), which concerns disorders of the spine.  Listing 1.04(A) applies to:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:
>
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine) . . . .

20 C.F.R. Pt. 404, subpt. P, app. 1 § 1.04(A).

### a.     The ALJ's first decision and the Court's remand order

In his first decision in this case, dated December 21, 2005, the ALJ's discussion of Listing 1.04(A) consisted of the following:

> The claimant's attorney also contends that the claimant meets or equals Listing 1.04; however, although the claimant has a herniated nucleus pulposus, there is no evidence of compromise of a nerve root or the spinal cord with evidence of nerve root compression or spinal arachnoiditis or lumbar spinal stenosis resulting in pseudo claudication.
>
> The claimant's obesity as an aggravating factor has been considered with

respect to each of these listed impairment. The combined effects of obesity can be greater than the effects of the claimant's impairments considered separately. In this instance, however, even taking the claimant's obesity into account, the obesity does not reduce the claimant's residual functional capacity below the sedentary exertional level.

R. 17.

As indicated earlier, the Court remanded the case on June 25, 2007 partly due to the fact that there was new evidence bearing on whether there was compromise of a nerve root – specifically, the December 15, 2005 EMG test results. In remanding the case, the Court also found deficient the ALJ's discussion of Listing 1.04. The Court noted that under the law, the ALJ was required to "build an accurate and logical bridge from the evidence to his conclusion" and to "confront the evidence that does not support his conclusion and explain why it was rejected." *Smith I*, slip op. at 9 (internal quotation marks and citation omitted). The Court stated: "With regard to the nerve root compression issue, the ALJ offered no such explanation. He failed to elaborate on his conclusory statement that there was no evidence of compromise of a nerve root and failed to explain why the medical evidence Smith offered did not equal a listed impairment, specifically, Listing 1.04." *Id.*

**b.    The ALJ's December 5, 2008 decision**

In his second decision, dated December 5, 2008, the ALJ addressed Listing 1.04(A) as follows:

Regarding the claimant's lumbar spine, the records cited above showed that there were multiple x-rays and MRIs of the claimant's spine but none showed of [sic] nerve root compression or spinal arachnoiditis. Additionally, none showed any evidence of lumbar spinal stenosis resulting in pseudoclaudication as required under Listing 1.04, *Disorders of the Spine*. Dr. William Newman, an orthopedic physician and the

medical expert witness at the hearing, opined that the claimant was
capable of performing a wide range of light exertional work.  Dr. William
Newman also opined that the claimant did not meet or equal any listing.

R. 295.

The ALJ's references to whether there was evidence of "spinal arachnoiditis" or
"stenosis resulting in pseudoclaudication" concern Listing 1.04(B) & (C), not 1.04(A).
Thus the ALJ's discussion of Listing 1.04(A) amounts to three brief points contained in
two sentences:  the x-rays and MRIs did not show nerve root compression; Dr. W.
Newman opined that Smith was capable of performing light work; and Dr. W. Newman
opined that Smith did not meet or equal a listing.  The second of those points – Smith's
capability of performing light work – actually has no bearing on whether she met the
requirements of Listing 1.04(A); rather, that point concerns Smith's RFC.  In short, the
ALJ's reasoning regarding Listing 1.04(A) boils down to a statement that there was no
evidence in Smith's x-rays or MRIs of nerve root compression and that Dr. W. Newman
did not believe that Smith met or equaled any listed impairment.

### c.    Smith's contentions

Smith argues that the ALJ's finding that her impairments did not meet or equal
Listing 1.04(A) is not supported by substantial evidence.  With regard to the threshold
requirement of a spinal disorder resulting in compromise of a nerve root, Smith points to
her July 2005 MRI, which indicated that she had a bulging disc.  She argues that the
distinction between a bulging disc and a herniated disc is merely semantic.  *See* Pl.'s
Brief 10.  Smith also notes that the same MRI showed neuroforaminal narrowing (albeit
"mild" narrowing) – a condition that leads to spinal nerve compression.  *See id.* 9-10 &
n.4.  Finally, Smith contends that the evidence also showed she had the remaining

18

elements of Listing 1.04(A): neuro-anatomic distribution of pain; limitation of motion of her spine; motor loss; sensory reflex loss; and positive straight-leg tests. *See id.* 10-11.

### d. Discussion

"In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004). The ALJ need not discuss every piece of evidence, but he must evaluate evidence supporting the claimant's position to give the reviewing court confidence that he engaged in a thorough consideration of the record. *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006). The ALJ "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto*, 374 F.3d at 474.

The ALJ's discussion of Listing 1.04(A) – such as it was – did not meet these basic requirements. The threshold requirement of Listing 1.04 is evidence of a disorder of the spine that results in compromise of a nerve root or the spinal cord. The ALJ's analysis of this point was perfunctory at best. As indicated earlier, the ALJ stated only that Smith's x-rays and MRIs showed no nerve root compression. R. 295. This represented only a slight change to, and no real improvement of, the ALJ's original explanation that the Court had found deficient when it remanded the case.

More importantly, the ALJ did not address the December 2005 EMG test, the results of which cut against his finding that there was no nerve root compression. Neurologist Dr. Ralph Cabin reported that the December 2005 EMG test was "compatible with chronic radiculopathy," R. 441, a finding that the SSA's consultant at

19

the second hearing, Dr. W. Newman, confirmed.  R. 500.  Dr. W. Newman went on to define chronic radiculopathy as nerve irritation caused by something pushing against or compressing a nerve.  R. 518-19.  In short, the December 2005 EMG test was indicative of nerve root compression.[1]  Yet the ALJ made no mention of this test result, and certainly did not "confront" it, when he concluded that Smith had not shown compression of a nerve root.

That is not to say that the ALJ omitted any mention of radiculopathy.  In fact, the ALJ found earlier in his decision that radiculopathy was one of Smith's "severe" impairments.  *See* R. 294.  He did not, however, note the connection between this point and nerve root compression, even though the SSA's own consultant, Dr. W. Newman, had drawn just such a connection.  Nor did the ALJ make any mention of the finding of radiculopathy when he rejected Smith's contention that her impairments met or equaled Listing 1.04(A).

The ALJ's perfunctory discussion of Listing 1.04(A), and his failure to address the December 2005 EMG test in that discussion, are particularly troubling in light of the Court's earlier remand order.  When this Court remanded the case to the SSA for further consideration, it did so specifically so that the ALJ could address the impact of the EMG test.  Yet the ALJ did not do this.

---

[1]  Dr. W. Newman appears to have attributed this to foraminal narrowing rather than to a herniated disk, *see* R. 519, but the distinction makes no difference; Listing 1.04(A) does not require a herniated disk or any particular condition other than a "disorder[ ] of the spine."  The Court also notes that Dr. W. Newman's phrase "narrowing of the left neural foraminal" is another way of referring to "foraminal stenosis," which is specifically mentioned in Listing 1.04(A); stenosis is a synonym for narrowing.  It is noteworthy that Dr. Elmes, whose opinion both Dr. W. Newman and the ALJ rejected, also attributed Smith's radiculopathy to foraminal stenosis.  R. 347.

In addition, as noted earlier, the Court specifically found deficient the ALJ's original explanation for his determination that Smith had not met the requirements of Listing 1.04(A). But the explanation that the ALJ gave in his second decision did not improve on the earlier, deficient explanation. Indeed, the ALJ's revised explanation in the second decision actually *omitted* two points that he had included in his first decision. The first was a point favorable to Smith – the finding that she had a herniated nucleus pulposus. *See* R. 17. No mention of this earlier favorable finding is found in the ALJ's discussion of listing 1.04(A) in the second decision. The second point omitted in the ALJ's second decision is any consideration of Smith's obesity, a topic to which the Court will return momentarily. Nothing in the ALJ's discussion of the listed impairments so much as hints that he considered Smith's obesity in determining whether she met or equaled a listed impairment.

The ALJ's explanation for again finding against Smith on Listing 1.04(A) cannot fairly be said to satisfy the requirement that an ALJ "build an accurate and logical bridge from the evidence to [his] conclusion," *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002), even though this Court had cited exactly that requirement in finding the ALJ's original explanation deficient. In the decision under review, the ALJ generally cited x-rays and MRIs, but he did not address contrary evidence, including the 2005 EMG test.[2] The ALJ's unadorned reference to Dr. W. Newman's conclusory statement that Smith

---

[2] It is true, as the Commissioner points out, that the applicable regulations note that electrodiagnostic procedures can be "useful in establishing the clinical diagnosis, but do not constitute alternative criteria to the requirements of 1.04." 20 C.F.R. § 404, subpt. P, app. 1 §1.00(C)(3). But the results of the EMG were relevant to the criterion the ALJ said was missing. The ALJ could not properly skip over the EMG test result in addressing Listing 1.04(A) – particularly when the Court had remanded the case specifically to permit consideration of that test.

did not have any listed impairment does not save the ALJ's otherwise inadequate explanation. During his testimony, Dr. W. Newman did not reference the requirements of Listing 1.04(A), let alone address them point by point. *See* R. 512.

For the same reasons, the ALJ's explanation regarding Listing 1.04(A) did not meet the requirement that an ALJ confront the evidence that does not support his conclusion and explain why he rejected it. The ALJ did, to be sure, *catalog* the evidence, including the December 2005 EMG report, in the "Summary of Evidence" section of his decision. But cataloguing is no substitute for analysis or explanation. The Court cannot simply assume that the ALJ took the EMG into account in addressing Listing 1.04(A) when he did not say, or even hint, that he did so.

The ALJ also failed to address the other evidence that Smith cited for why she met the requirements of Listing 1.04(A), including evidence of neuro-anatomic distribution of pain; several treating physicians' findings that she had limitation of motion in her spine; evidence of motor loss, including decreased strength in her left leg and an inability to squat; sensory reflex loss (in particular in her left ankle); and positive straight-leg tests, as several treating physicians found.

In response, the Commissioner argues that there was no evidence of the sort of motor loss that the listing requires. *See* Def.'s Br. 4-5. He argues that only two physicians who examined Smith found any motor weakness and that these physicians, Dr. Slack and Dr. Elmes, found only very slight motor loss in Smith's left leg. (The Court notes that the Commissioner does not contend that evidence on any of Listing 1.04(A)'s other requirements was similarly lacking.)

There are several problems with the Commissioner's argument. First, the ALJ

22

did not discuss any of this evidence in finding that Smith's spinal impairment did not meet or equal the requirements of Listing 1.04(A). The Court cannot properly affirm the ALJ's decision based on a rationale the ALJ did not articulate. *See SEC v. Chenery*, 318 U.S. 80, 87-88 (1943); *Martinez v. Astrue*, ___ F.3d ___, 2011 WL 148810, at *1 (7th Cir. Jan. 19, 2011). Nothing in the ALJ's brief discussion of Listing 1.04(A) suggests that he relied on the absence of evidence of motor weakness.

Second, it is undisputed that two doctors who examined Smith found some degree of motor loss in her left leg. Listing 1.04(A) does not require any particular degree of motor loss. In other words, the listing does not have a separate severity threshold for that particular requirement.

Third, and significantly, the ALJ completely failed to address the effect of Smith's obesity on whether her impairments met or equaled the requirements of Listing 1.04(A). The SSA's disability regulations specifically require consideration of the "additional and cumulative effects of disability" in determining whether an obese person has a listed impairment or combination of impairments, because "[t]he combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately." 20 C.F.R. § 404, subpt. P, app. 1 § 1.00(Q); *see Clifford*, 227 F.3d at 873 ("The regulations require the agency to consider the combined effect of all of the claimant's ailments," including obesity.).

It is undisputed that Smith is obese. As she points out in her brief before this Court, given her height of 5'5" and her weight of 265 pounds, *see* R. 345 (report of Dr. Elmes), she has a body mass index of 44.1, which equates to "extreme" obesity. *See*

Pl.'s Br. 7. Though the SSA's consulting physician, Dr. W. Newman, was aware of Smith's obesity, *see* R. 507, it is unclear how or even whether he took this into account. And the ALJ made no mention of Smith's obesity when discussing whether she met or equaled a listing. R. 295. As indicated earlier, this was a step *backward* from the ALJ's earlier, deficient discussion regarding Listing 1.04(A), in which he had at least mentioned that he had considered Smith's obesity. *See* R. 17.

For these reasons, the ALJ's explanation of his decision that Smith's impairments did not meet or equal Listing 1.04(A) is just as deficient as his original explanation that formed the basis for the earlier remand order – if not more so. *See generally Ribaudo*, 458 F.3d at 583-84 (finding insufficient a two-sentence explanation regarding Listing 1.04). A court "cannot uphold an administrative decision that fails to mention highly pertinent evidence or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (internal citation omitted).

**4.    Smith's ability to work**

Smith challenges the ALJ's determination that she was able to perform her past work as a dietary aide, as well as other types of work. The ALJ  based this on his findings regarding Smith's RFC, which she likewise challenges.

The Court notes that if Smith meets or equals a listed impairment, she is entitled to benefits, and her ability to perform her past work is immaterial. The Court nonetheless addresses the RFC issue in the event it is reached on remand.

Smith's first point is that the ALJ's finding contradicts his original decision, in

which he found that Smith was *unable* to perform her past work.  Because new

evidence was presented at the second hearing, the ALJ was permitted to revisit this

issue.  Altering his conclusion, however, was appropriate only if the new evidence

changed things.  *Cf. Wilder v. Apfel*, 153 F.3d 799, 903 (7th Cir. 1998) (finding by court

on appeal from ALJ's ruling is binding on SSA on remand unless there is new evidence

that undermines the previous ruling).

There is no question that there was new evidence presented at the second

hearing.  The new evidence consisted of the December 2005 EMG test; the November

2007 MRI examination of Smith's left knee; the post-December 2005 conclusions of

Drs. D. Newman and Slack; the EMG test on Smith's right arm and treating physician's

opinion that she had mild to moderate carpal tunnel syndrome in that arm; the opinion

of Dr. Benitez; the opinion of Dr. Elmes; and the opinion of Dr. W. Newman.  At least

some of this evidence – in particular, Dr. W. Newman's opinion – contradicted the ALJ's

original RFC determination.  Thus the Court cannot conclude that it was *per se*

inappropriate for the ALJ to alter that conclusion.

More problematic, however, was the basis on which the ALJ appears to have

rejected most of the new evidence (except for Dr. W. Newman's opinion), as well as the

opinions of several of Smith's treating physicians.  Specifically, the ALJ's

determinations about Smith's RFC, her ability to perform her past job as a dietary aide,

and her ability to perform other work, all turned largely on his assessment of her

credibility.  The ALJ himself made this clear during the April 2008 hearing when he

stated that "I want to make clear that if I consider the complaints of the Claimant to be

credible, that of course there's no work that would be available, that she would be

disabled."  R. 563.

The ALJ found that Smith's claims about her symptoms lacked credibility and also that she had deceived several of the physicians who examined her.  This was not altogether different from the conclusion the ALJ reached in his initial ruling regarding Smith's claim in 2005.  In that ruling, the ALJ stated that he did not find Smith's description of her pain and limitations entirely credible and that her claims were undercut by the inconsistency of the objective medical evidence with what she was claiming, and the inconsistency of her claims over time.  R. 18.

In remanding Smith's case for further consideration, the Court concluded that the ALJ's explanation was insufficient.  *See Smith I*, slip op. at 9.  The Court noted that "an ALJ 'cannot reject a claimant's testimony about limitations on her daily activity solely by stating that such testimony is unsupported by the medical evidence.'"  *Id.* (quoting *Indoranto*, 374 F.3d at 474).  The Court stated that "the ALJ appears to have done exactly what the Seventh Circuit has found inappropriate," *id.*, by failing to explain his rationale for crediting some parts of the medical evidence and not other parts and by giving "short shrift to Smith's last medical evaluation before the hearing, in which Dr. Ogan found her pain complaints to be consistent with the medical evidence."  *Id.* at 9-10.  The Court also rejected the ALJ's reliance on the purported inconsistency of Smith's complaints over time, stating that "[i]f there is one constant in Smith's voluminous medical records, it is the consistency of her complaints of pain regardless of the results of her medical testing."  *Id.* at 10.

This time the ALJ gave a more detailed explanation for his finding that Smith

lacked credibility. *See* R. 299-300. First, the ALJ stated that although Smith testified she had significant knee pain since the accident, it hurts every day, and this plus her back pain require her to lie down seventy percent of the day, the medical evidence showed only that she initially had a bruised patella (knee cap) that resolved; Dr. W. Newman, the SSA's consultant, opined that she had only minor arthritis; and Dr. D. Newman "could report no significant objective findings to explain her presentation of extreme limitation and . . . severe left knee pain," other than chondromalacia. R. 299.

The ALJ further stated that Smith had made "little mention to her doctors" of her claims regarding the extent of her limitations due to her knee and back pain, including her claim that this caused her to lie down seventy percent of the day. *Id.* The ALJ also stated that Smith's claim was "contravened by the many objective medical imaging reports over the years . . . .," in particular the fact that "[t]he reports establish that the claimant never had a herniated disk . . . ." *Id.* The ALJ noted that Dr. D. Newman had reported that Smith had a herniated disk that required surgery but found that in saying this, Dr. D. Newman "was laboring under [a] misimpression . . . .," pointing out that Dr. D. Newman had previously found nothing of significance concerning Smith's back and had "doubted that the bulging disk was the cause of her pain." *Id.*

The ALJ also stated that despite Smith's testimony that she had pain in her right arm and could do nothing with it due to pain and numbness, this was "very far afield from what Dr. [W.] Newman suggested was mild right carpal tunnel syndrome." *Id.* The ALJ stated that "[i]t strains credulity when the claimant contends that she is a one armed person for all intents and purposes when the reliable, medical evidence points to

only a mild condition." *Id.*

Finally, the ALJ stated that "the record shows that claimant has enhanced her story during her medical visits." R. 300. He accused her of lying to her doctors, stating that she "told Dr. Goldberg that she had a herniated disc that required surgery," when "there is simply no indication in the record that the claimant ever had a herniated disc." *Id.* The ALJ also stated that Smith "failed to accurately report her medical information when she told Dr. Mohan that she had ligament and cartilage tear of the knee," when there was nothing in the record to indicate this. *Id.*

Courts give deference to an ALJ's determination of a claimant's credibility and, generally speaking, reverse such a determination only if it is "patently wrong." *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003). In this case, however, the ALJ's assessment of Smith's credibility was not premised upon her demeanor or other subjective factors but rather turned on purportedly objective factors and claimed implausibility. When, as in this case, the ALJ's credibility determination "rests on 'objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision.'" *Indoranto*, 374 F.3d at 474 (quoting *Clifford*, 227 F.3d at 872).

In the last of his points, the ALJ found that Smith falsely told Dr. Goldberg that she had a herniated disk that required surgery and falsely told Dr. Mohan that she had ligament and cartilage damage in her knee. The ALJ's finding about what Smith supposedly told Dr. Goldberg is not simply unsupported by substantial evidence; it is just plain wrong. Dr. Goldberg wrote in his notes in February 2006 that Smith had a

28

herniated disk that required surgery, *see* R. 411, but his notes did not attribute that statement to Smith.  Rather, the record reflects that Dr. Goldberg received a letter from Dr. D.  Newman that said exactly that.  *See* R. 340.  So even if Smith repeated this to Dr. Goldberg, it was not a false statement; it was what a medical doctor had told her. The Court also notes that in his original decision in December 2005, the ALJ *himself* found that Smith had a herniated disk.  *See* R. 17.  Surely the ALJ could not appropriately find Smith to lack credibility for repeating to a doctor what the ALJ himself had found just two short months earlier.

The ALJ likewise gave an inaccurate rendition of what Smith told Dr. Mohan.  In a letter to Dr. Goldberg dated May 17, 2005, Dr. Mohan reports that Smith said she *had been told* she had ligament and cartilage tear and that she had not seen an orthopedic surgeon.  *See* R. 444.  The ALJ, however, attributed the claim of ligament and cartilage tear to Smith herself; he left out that Smith had said this is what she had been told. More importantly, he cited nothing in the record to reflect that Smith inaccurately reported what she had been told by other doctors.  To the contrary, the record reflects that Smith was referred for an MRI on her knee in October 2003 due to "the possibility of a medical or ligamentous tear."  R. 157.  This provides a rather strong basis to believe that the physician who referred Smith for the MRI, Dr. Manuel Banuelos, likewise told Smith that she might have a torn ligament.  In any event, as Smith points out, the record does not include any medical records from the 2003 time frame describing her treatment by Dr. Banuelos or identifying what he told her.  The Court is hard pressed to see how the ALJ could properly infer from this record that Smith lied to

Dr. Mohan.

Though he did not refer to it in the "credibility" section of his decision, the ALJ also stated that Smith made an inaccurate statement to Dr. Ogan to the effect that she might have to undergo arthroscopic surgery to her knee.  R. 301.  The ALJ's comment that this was inaccurate was, again, completely incorrect:  one month earlier, Dr. D. Newman had reported that if Smith's knee pain persisted, arthroscopy was a possibility. *See* R. 209.

In short, the ALJ's negative assessment of Smith's credibility was unsupported by substantial evidence to the extent he based it on her purported false statements to her physicians.  Given the extent to which the ALJ appears to have relied on this, the error would be enough by itself to require the Court to overturn the ALJ's credibility assessment and thus his RFC and ability-to-work determinations.

But there is more.  The ALJ placed significant weight on Smith's purported failure to describe to her physicians impairments as severe as what she claimed at the hearing:  pain of six on a one-to-ten scale, and her statement that she had to lie down seventy percent of the day due to her back and leg pain.  As the Court noted in its 2007 decision, however, Smith has consistently reported significant levels of pain. Throughout 2004 and 2005, Smith consistently reported to Dr. Greathouse that she had chronic lower back pain that was not helped, or not helped much, by various pain medications.  *See, e.g.*, R. 223, 225, 227, 230, 231, 232 & 234.  In November 2004, Smith told Dr. Biale that she could not bend over and that it was painful "when she sits or stands and she has to change position" as well as "when she walks, climbs or stands."  R. 182.  In August 2005, she reported to Dr. D. Newman that she "has pain

almost continuously in her low back.  Walking, climbing and standing all increase her pain.  *She can lay down and get some relief*."  R. 211 (emphasis added).  She told Dr. Torres in September 2005 that she had "continuous" back pain, which was "increased by walking, moving, bending especially, *and is improved by resting*."  R. 215 (emphasis added).  She similarly told Dr. Ogan in November 2005 that her pain was "exacerbated with walking, bending, prolonged sitting and coughing" and that her pain "is relieved with ibuprofen *and rest*."  R. 204 (emphasis added).  And the list goes on.  In short, the ALJ's determination that Smith's claims at the hearing somehow exceeded, in both kind and degree, what she told doctors about her pain was unsupported by substantial evidence.

The ALJ also understated or disregarded medical evidence, including results of objective tests, when he minimized Smith's knee impairment on the way to finding her claims about knee pain to lack credibility.  Specifically, the ALJ stated in his credibility discussion that the objective evidence showed with regard to Smith's left knee that she had only a bruised knee cap that resolved and that she had only minor arthritis.  Yet MRI examinations from both 2003 and 2007 showed that she had prepatellar bursitis – a different condition from either a bruised knee cap or arthritis.  It seems entirely reasonable that bursitis that persisted over a period of four years could cause a person significant pain, particularly if, like Smith, she is obese and thus puts a good deal of weight on the knee when standing or walking.

The Court does not discount the fact that the record provides some basis for doubting Smith's credibility, at least regarding the full extent of her symptomatology.  "[D]iscrepancies between objective evidence and self-reports may suggest symptom

exaggeration." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).   Among other

things, Dr. Elmes reported in 2007 that Smith might be "magnif[ying]" her symptoms,

and Dr. Greathouse's notes from 2004 express concern about "malingering."  Yet both

of these doctors, despite their concerns, found Smith to be significantly impaired:  Dr.

Greathouse's notes reflect a willingness to fill out disability papers for Smith, and Dr.

Elmes – who was retained by the SSA – found Smith's RFC to be significantly lower

than what the ALJ ultimately found.  In any event, "magnification" – the equivalent of

exaggeration – is not the same thing as "fabrication."

More generally, as Judge Posner noted when writing for the court in *Carradine v.*

*Barnhart*, 360 F.3d 751 (7th Cir. 1994), it is not unusual for pain, even severe pain, to

exist "even in the absence of 'objective' medical findings, that is, test results that

demonstrate a physical condition that normally causes pain of the severity claimed by

[the] applicant."  *Id.* at 753.  The SSA's own regulations likewise acknowledge this.  *See*

20 C.F.R. § 404.1545(e) ("Pain or other symptoms may cause a limitation of function

beyond that which can be determined on the basis of the anatomical, physiological or

psychological abnormalities considered alone . . . .").  The Seventh Circuit has stated

that "[o]nce the claimant produces medical evidence of an underlying impairment, the

Commissioner may not discredit the claimant's testimony as to subjective symptoms

merely because they are unsupported by objective evidence."  *Lester v. Chater*, 81 F.3d

821, 834 (7th Cir. 1995), *quoted in Carradine*, 360 F.3d at 753; *see also Indoranto*, 374

F.3d at 474; 20 C.F.R. § 404.1529(c)(2) (the SSA will not reject statements about the

effect pain has on an individual's "ability to work solely because the available objective

medical evidence does not substantiate [her] statements."). In his decision, the ALJ specifically found the predicate for application of this rule when he found ""that the claimant's medically determinable impairments could reasonable be expected to cause the alleged symptoms." R. 298. Yet Dr. W. Newman, whose opinion the ALJ accepted without exception, appears to have applied a contrary rule when he rejected Smith's statements and effectively insisted on objective evidence to confirm the severity of her symptoms.

**5.     The appropriate relief**

For the reasons stated above, the Court reverses the ALJ's decision denying Smith's claim for benefits. The Court thus need not address the other arguments Smith makes in support of reversal.

Smith asks the Court to direct an award of benefits rather than remanding the case to the SSA for further consideration. The Seventh Circuit has recently made clear, however, that although a court has the authority to award benefits, it may appropriately do so "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion – that the applicant qualifies for disability benefits." *Allord v. Astrue*, ___ F.3d ____, 2011 WL 102599, at *3 (7th Cir. Jan. 13, 2011). That is not the case here. Because, however, the ALJ essentially ignored at least one major directive that this Court imposed in its 2008 ruling, the Court urges the Commissioner to assign a new ALJ to the case on remand. *See, e.g., Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 357 (7th Cir. 2005); *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003); *Sarchet v. Chater*, 78

F.3d 305, 309 (7th Cir. 1996).

## Conclusion

For the reasons stated above, the Court grants plaintiff's motion for summary judgment [# 29] and denies the Commissioner's cross motion for summary judgment. The Court directs the Clerk to enter judgment reversing the denial of disability insurance benefits and SSI benefits and remanding the case to the Social Security Administration for further proceedings consistent with this decision.

MATTHEW F. KENNELLY
United States District Judge

Date:  February 22, 2011